Dan Lawton, California SBN 127342
dan@lawtonlaw.com
Joseph C. Kracht, California SBN 228507
joe@lawtonlaw.com
LAWTON LAW FIRM
Emerald Plaza
402 West Broadway, Suite 1860
San Diego, CA 92101
Telephone: (619) 595-1406
Facsimile: (619) 595-1520

Attorneys for Plaintiff Jeffrey Baker

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY BAKER, a natural person,<br>Plaintiff,<br>v.<br>BRIAN WHITE, a natural person; LEE GEORGE PARTRIDGE, a natural person; SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION, an independent association; INTEGRITY CAPITAL SERVICES LLC, a Nevada limited liability company; and DOES 1 through 50, inclusive,<br>Defendants. | Case No. '12CV1273 W WMc<br><br>COMPLAINT FOR DAMAGES AND OTHER RELIEF FOR VIOLATIONS OF CIVIL RIGHTS, VIOLATIONS OF CALIFORNIA LABOR CODE SECTION 1102.5, AND VIOLATION OF CALIFORNIA GOVERNMENT CODE SECTION 53298 *et seq.*, AND DEMAND FOR JURY TRIAL |

**NATURE OF THIS ACTION**

1. Plaintiff Jeffrey Baker ("Mr. Baker") was an investment officer for the San Diego County Employees Retirement Association (SDCERA). Mr. Baker reported to government agents and his superiors at SDCERA violations of SDCERA's risk budget for high yield and U.S. Treasury programs set by SDCERAs Investment Policy Statement (IPS). Mr. Baker also reported that the violations were being deliberately concealed from the SDCERA board.

2. Mr. Baker's superiors, defendants Brian White and Lee Partridge, carried out a malicious, oppressive, and fraudulent campaign of silencing and retaliating against Mr. Baker. They reduced the scope of his duties, removed him from monitoring their risk budget violations, eliminated his job, terminated his employment, contrived false stories about him, sabotaged his rights to a fair administrative hearing, and violated his civil and constitutionally-guaranteed rights.

3. White and Partridge also carried out a cover-up of their risk budget violations, Mr. Baker's reporting of those violations, and their retaliation against him.

4. Mr. Baker suffered severe damages as a direct and proximate result of the wrongful and unlawful conduct of Mr. White and Mr. Partridge. They took away his job, his reputation, and his future opportunity for employment. Mr. Baker is a Chartered Financial Analyst which is a highly regarded professional

designation. He has suffered permanent damages as a direct and proximate result of the wrongful and unlawful conduct of Mr. Baker and Mr. Partridge.

5. Mr. Baker brings this action to recover for the damages caused by Mr. Partridge and Mr. White who acted for and on behalf of SDCERA. Mr. Partridge knowingly interfered with Mr. Baker's contract of employment with SDCERA under which Mr. Baker had a probability of future economic benefits. Mr. Partridge engaged in intentional acts designed to disrupt Mr. Baker's contractual relationship with SDCRA. Mr. Partridge actually disrupted the relationship, causing Mr. Baker substantial damages.

## II.

## JURISDICTION AND VENUE

6. This is an action brought in part under 42 U.S.C. § 1983 to recover damages against defendants Lee Partridge and Brian White for violation of Mr. Baker's constitutionally-guaranteed rights of free speech, petition, and due process. The jurisdiction of this Court is predicated on 28 U.S.C. §§ 1331 and 1343.

7. This Court has jurisdiction of the claims arising under California law under 28 U.S.C. 1367. There is a substantial federal claim (under 42 U.S.C. § 1983) alleged over which this court has subject matter jurisdiction. Both the state and federal claims derive from a common nucleus of operative facts so that Mr. Baker would ordinarily be expected to try them all in one judicial proceeding.

8. A substantial part of the events giving rise to this action occurred in San Diego County, California. Venue is therefore proper under 28 U.S.C. § 1391(b).

9. The Court has supplemental jurisdiction to hear the State of California claims under 28 U.S.C. § 1367 because this is a civil action of which this district court has original jurisdiction and because the state claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## III.

## PARTIES AND PLAYERS

10. Mr. Baker is a natural person and a resident of the County of San Diego. Mr. Baker was a loyal SDCERA Investment Officer, covering the public markets for SDCERA. He had been employed by SDCERA as an Investment Officer since December 21, 2007. Mr. Baker's duties included monitoring SDCERA investment advisers and investment managers and SDCERA's plan assets to make sure they complied with SDCERA's investment policy described below.

11. Mr. Baker is a Charter Financial Analyst (CFA). The CFA designation is considered the gold standard of the investment management field and those who have the credential have an in-depth knowledge of the investment industry.

Obtaining the qualification is no easy feat; the self-study program takes several years to complete and participants must pass three six-hour exams, as well as agree to abide by a strict code of ethics and standards of conduct.

12. SDCERA advertised a job opening for an investment officer, who was needed to help manage the SDCERA investments. SDCERA emphasized that a CFA designation was highly desirable. Mr. Baker responded to the ad. SDCERA hired him to act as an investment officer for SDCERA beginning in December 2007.

13. SDCERA induced Mr. Baker to take a job as a SDCERA investment officer by representing to Mr. Baker that SDCERA considered Mr. Baker's CFA professional designation to be an important to his responsibilities as an SDCERA investment officer.

14. SDCERA induced Mr. Baker to take the investment officer position by representing he would be responsible for monitoring compliance with SDCERA's investment policies and risk budgets in public markets.

15. SDCERA further induced Mr. Baker to take a position as an investment officer with SDCERA by representing to him he would be responsible for monitoring SDCERA investments to ensure they were made in conformity with the requirements of California State law including the fiduciary duties that government the management of public pensions under Article 16 Section 17 of the California State Constitution.

B. Defendants

16. Defendant SDCERA is a public retirement system and an independent association created pursuant to the County Employees Retirement Law of 1937, California Government Code § 31450 *et seq.* SDCERA has some 36,000 members and some $8 billion in assets under management. Benefits are funded by taxpayer contributions, member contributions, and investment returns. Its assets are trust funds. Despite the failure of the statute and case law to define the exact nature of retirement associations, all of the cases treat such associations as government agencies rather than private entities. Despite the failure of the statute and case law to define the exact nature of retirement associations, all of the cases treat such associations as government agencies rather than private entities for purposes of civil liability. *See, e.g., Freedom Newspapers, Inc. v. Orange County Employees Retirement System*, 6 Cal.4th 921, 924 (Cal. 1993); *Board of Retirement v. Santa Barbara County Grand Jury*, 58 Cal.App.4th 1185, 1195 (Cal. App. 1997).

17. Defendant SDCERA's board is its governing body. Its members owe plan members and beneficiaries a fiduciary duty to manage the investments with care, skill and prudence. Statutory duties and responsibilities of board trustees originate primarily from the Constitution of the State of California and the California Government Code.

18. SDCERA's board members are David A. Meyers, Chairman (elected by SDCERA members); Martin Cherry, Vice Chairman (elected by SDCERA members); Marc Doss, Secretary (appointed by the County Board of Supervisors); Peter Q. Davis (appointed by the County Board of Supervisors); Diane Jacobs (appointed by the County Board of Supervisors); Dan McAllister, County Treasurer (mandated by law); E. F. "Skip" Murphy (elected by SDCERA retired members); Doug Rose (elected by SDCERA general members); and Dick Vortmann (appointed by County Board of Supervisors).

19. Defendant Brian White is a natural person and was, at all times mentioned in complaint, a government agent and chief executive officer of SDCERA. He was a SDCERA employee acting under color of State authority. Mr. White is a resident of the County of San Diego.

20. Defendant Lee Partridge is a natural person and was, at all times mentioned in this complaint, a government agent. He acted in the capacity of a SDCERA employee acting under color of State authority. Partridge at some times alleged herein was a resident of San Diego County and transacted business in that County. On information and belief he is a resident of the State of Texas.

21. Defendants White and Partridge are sued in their individual capacities. Defendants were, at all times mentioned in this complaint, acting under color of state law.

22. Mr. White was the SDCERA agent who hired Mr. Baker. Mr. Partridge was the SDCERA agent who supervised Mr. Baker.

23. Defendant Integrity Capital Services, LLC ("Integrity Capital") is a limited liability company organized and existing under the laws of the State of Nevada and having as its principal place of business, among others, Houston, Texas, and which is authorized to do business and doing business in the State of California. It is the current employer of Partridge, who used it to contract to provide investment management services with SDCERA. Integrity Capital was under the control of Partridge, who maneuvered SDCERA into signing a lucrative contract with Integrity Capital so that he could be exempt from County rules forbidding employees from being paid more than $301,00 per year. Integrity's multi-year contract with the County could be worth up to $4.5 million to Partridge. Partridge resides in Houston, Texas.

24. On November 19, 2010 Salient Partners L.P. announced it had acquired Integrity Capital and named Partridge as Salient's Chief Investment Officer. Salient Partners, L.P.'s General Partner is Salient Capital Management LLC.

25. The true names and capacities, whether individual, corporate, associate, representative or otherwise, of DOES 1 through 100, inclusive, are unknown to Mr. Baker, who therefore sues them by such fictitious names. Mr. Baker will seek leave to amend this complaint to show the true names and

capacities of said defendants when they are ascertained. Mr. Baker is informed and believes, and thereupon alleges, that each of the defendants named as a Doe, along with the named defendants, is responsible in some manner for the occurrences herein alleged, and that Mr. Baker's injuries herein alleged were legally or proximately caused by said defendants. Wherever it is alleged that any act or omission was also done or committed by any specifically named defendant, or by defendants generally, Mr. Baker intends thereby to allege, and does allege, that the same act or omission was also done and committed by each and every defendant named as a Doe, and each named defendant, both separately and in concert or conspiracy with the named defendants.

26. At all times mentioned herein, defendants, and each of them, were the agents, servants, co-conspirators, or employees of one another, and the acts and omissions herein alleged were done or suffered by them, acting individually and through or by their alleged capacity, within the scope of their authority. Each of the defendants aided and abetted and rendered substantial assistance in the accomplishment of the acts complained of herein. In taking the actions, as particularized herein, to aid and abet and substantially assist in the commission of the misconduct complained of, each defendant acted with an awareness of his, her or its primary wrongdoing and realized that his, her or its conduct would substantially assist in the accomplishment of that misconduct and was aware of his, her or its overall contribution to, and furtherance of the conspiracy, common

enterprise, and common course of conduct. Defendants' acts of aiding and abetting included, *inter alia*, all of the acts each defendant is alleged to have committed in furtherance of the conspiracy, common enterprise, and common course of conduct complained of herein.

C. Players

27. The Board of Supervisors of the County of San Diego appoints four of the nine Retirement Board members. In 1996, SDCERA hired its first Chief Executive Officer.

28. Mark Mimnaugh at all times alleged herein was a resident of San Diego County and SDCERA's Chief Operating Officer.

29. Lisa Needle at all times alleged herein was a resident of San Diego County. At times alleged Lisa Needle with SDCERA's acting CIO.

30. Ron Coca is a government official responsible for the County of San Diego Office of Internal Affairs' investigating and resolving reports of waste, abuse, and gross mismanagement. Mr. Coca failed to investigate Mr. Baker's complaints to the Office of Internal Affairs.

31. Mr. Coca has admitted he prepared a report regarding Mr. Baker's allegations based on material false information. Mr. Coca reported that Partridge had reported to the SDCERA board that the High Yield and U.S. Securities

programs were above their risk budgets when in fact Partridge had not so reported to the SDCERA board.

32. Southwest Strategies is a government influence firm hired by SDCERA to cover up SDCERA's wrongdoing.

## IV.

## THE FACTS

A. Standards

33. The County Employees Retirement Law of 1937 recognized a public obligation to San Diego County employees who become incapacitated by age or long service in public employment and accompanying physical disabilities by providing for retirement compensation and death benefits as additional elements of compensation for future service and to provide a means by which public employees who become incapacitated may be replaced by more capable employees to the betterment of public service without prejudice and without inflicting a hardship upon employees removed. *See* California Government Code § 31451.

34. The People of the County of San Diego adopted a Charter to protect their rights and to promote a just, honorable, and efficient government. The County of San Diego is a political subdivision of the State. The County has all the powers specifically stated and necessarily implied in general law and the Charter, including the power to assess, levy, and collect taxes. The County may exercise its powers only through a five-member Board of Supervisors or through persons authorized by

general law, the Charter, County ordinance, or by resolution, policy or order approved by the Board.

35. Under the California State Constitution, Article 16, Section 17, members of SDCERA are required to discharge their duties with respect to the SDCERA pension system with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims.

36. California Labor Code Section 1102.5 prohibits an employer from adopting or enforcing any policy preventing an employee from, or retaliating against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

37. Section 1102.5 also provides that an employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. An employer may also not retaliate against an employee for refusing to participate in an activity that would result in a violation of

state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

38. California Government Code sections 53928 (a) and 53926(c) prohibit any local agency officer, manager or supervisor from retaliating against any employee for filing a complaint with the local agency reporting “gross mismanagement, a significant waste of funds, or an abuse of authority.”

39. The CFA Institute awards the professional designation of Chartered Financial Analyst. Commitment to professional ethics is a core principal of Chartered Financial Analysts. The CFA Institute promotes high ethical standards and investor protection through professional codes of conduct, guidance, and outreach.

40. The Ethical Practices in Charter Financial Analysts Standards and Code provides that members must not knowingly make any misrepresentations relating to investment analysis, recommendations, actions, or other professional activities. Members must not engage in any professional conduct involving dishonesty, fraud, or deceit or commit any act that reflects adversely on their professional reputation, integrity, or competence.

41. Under the CFA Standards of Professional Conduct, CFAs must put the interest of their clients above those of their employer:

# CODE OF ETHICS AND STANDARDS OF PROFESSIONAL CONDUCT

CFA INSTITUTE

## STANDARDS OF PROFESSIONAL CONDUCT

**I. PROFESSIONALISM**

**A. Knowledge of the Law.** Members and Candidates must understand and comply with all applicable laws, rules, and regulations (including the CFA Institute Code of Ethics and Standards of Professional Conduct) of any government, regulatory organization, licensing agency, or professional association governing their professional activities. In the event of conflict, Members and Candidates must comply with the more strict law, rule, or regulation. Members and Candidates must not knowingly participate or assist in and must dissociate from any violation of such laws, rules, or regulations.

**B. Independence and Objectivity.** Members and Candidates must use reasonable care and judgment to achieve and maintain independence and objectivity in their professional activities. Members and Candidates must not offer, solicit, or accept any gift, benefit, compensation, or consideration that reasonably could be expected to compromise their own or another's independence and objectivity.

**C. Misrepresentation.** Members and Candidates must not knowingly make any misrepresentations relating to investment analysis, recommendations, actions, or other professional activities.

**D. Misconduct.** Members and Candidates must not engage in any professional conduct involving dishonesty, fraud, or deceit or commit any act that reflects adversely on their professional reputation, integrity, or competence.

**II. INTEGRITY OF CAPITAL MARKETS**

**A. Material Nonpublic Information.** Members and Candidates who possess material nonpublic information that could affect the value of an investment must not act or cause others to act on the information.

**B. Market Manipulation.** Members and Candidates must not engage in practices that distort prices or artificially inflate trading volume with the intent to mislead market participants.

**III. DUTIES TO CLIENTS**

**A. Loyalty, Prudence, and Care.** Members and Candidates have a duty of loyalty to their clients and must act with reasonable care and exercise prudent judgment. Members and Candidates must act for the benefit of their clients and place their clients' interests before their employer's or their own interests.

**B. Fair Dealing.** Members and Candidates must deal fairly and objectively with all clients when providing investment analysis, making investment recommendations, taking investment action, or engaging in other professional activities.

© 2010 CFA Institute

42. United States Code Title 42 § 1983 prohibits local governments from allowing their officials to intentionally violate a plaintiff's constitutionally-guaranteed rights.

43. United States Code Title 42 § 1983 also forbids government officials who acted under color of State law to violate intentionally a plaintiff's rights guaranteed by the First Amendment to the United States Constitution.

B. Investment Policy Statement (IPS)

44. In 2010, SDCERA adopted an Investment Policy Statement (IPS) as a primary method to ensure SDCERA complied with its fiduciary obligations under Article 16, section 17 of the California Constitution. The purpose of the IPS was "to provide a formal plan for investing pension trust fund assets to achieve defined investment objectives consistent with the SDCERA mission statement adopted by the Board and with applicable law."

45. The IPS governed all asset classes, types or forms in SDCERA's investment program and established the guidelines, policies and procedures for the management of SDCERA's diversified investment portfolio by the Board and Staff.

46. The budgeted amount of risk in SDCERA's March 2010 ISP associated with security selection within each asset class is set forth in the table below. Risk budgets set risks for risk taken with long-term assets. At the time, SDCERA set its risk budgets using "tracking error." Tracking error is a measure of how closely an asset class or portfolio follows the index to which it is benchmarked, and uses 36 months of trailing monthly returns. Common indices (like the Merrill Lynch High Yield Master II Index) are used as the benchmarks. The risk budget for High Yield was 200 basis points, and for U.S. Treasuries, 75 basis points:

| Asset Class | Benchmark | | Annualized Tracking Error Limit (bps) |
|---|---|---|---|
| Global Equities | MSCI World Net Index | | 200 |
| Emerging Market Equities | MSCI Emerging Markets Index | | 400 |
| High Yield | ML High Yield Master II | | 200 |
| Private Equity | Uninvested Portion: | 200 | 200 |
| | Invested Portion: | N/A | N/A |
| Emerging Market Debt (Local) | JP Morgan GBI--EM Global Diversified (Unhedged) | | 200 |
| Asset Allocation Strategies | 2/3 HFRI Macro + 1/3 Barclay's Hedge CTA Indices | | 800 |
| Relative Value Strategies | Three-Month Treasury Bills + 2% | | 400 |
| US Treasuries | Barclay's 10-yr UST Futures Index* | | 75 |

C. Mr. Baker Reports Risk Budget Violations

47. Promptly after the IPS went into effect, SDCERA's high yield assets exceeded the risk budgets set forth in the IPS, by a magnitude of nearly 400%. Alarmed, Mr. Baker brought this to Partridge's attention. Partridge said he was in the process of "rebalancing" the high yield program and had the board's permission to implement the new IPS over time.

48. As to U.S. Treasuries, the IPS called for allocating 40% of the total fund to consist of such bonds. In early July 2010, however, U.S. Treasuries comprised only 5% of the fund; at the end of that month, 17% (far below the 0% required).

49. Afterward, Partridge started recommending investment of SDCERA funds in financial instruments managed by a Hoisington Investment Management of Austin, Texas. He presented to the Board performance and risk data for an instrument ("Macro-Economic product") other than the one represented ("Core Duration Match"). The two products had risk profiles which differed greatly from one another. The Board then unwittingly approved investment of SDCERA funds in a *third* Hoisington instrument, the Core-Plus Duration Match – out of all three, the one with the highest risk. In so doing the Board thought it was approving investment in the less-risky Core Duration Match product. In the end Partridge caused SDCERA to invest some $200 million in Hoisington instruments. Partridge also built a SDCERA position in 30-year U.S. treasury futures. Both of these investments exceeded the risk budget of 75 basis points set by the IPS.

50. Beginning in and around August 2010 and continuing in and after 21 May 2011 Mr. Baker reported to his superiors, at least two SDCERA board members and two government agencies (1) SDCERA; and (2) the County of San Diego's Office of Internal Affairs that SDCERA officials and consultants were:

(a) Not discharging their duties with respect to SDCERA with care, skill, prudence, and diligence as required by California State Constitution Article 16 Section 17 by virtue of material violations of the IPS risk budget for SDCERA's high yield and U.S. Treasury programs;

(b) Engaging in (1) gross mismanagement, (2) significant waste of County funds, and (3) abuse of authority in violation of Government

Code Section by virtue of SDCERA failing to take action to bring its high yield and U.S. Treasury programs into compliance with their risk budgets under the SDCERA IPS;

(c) Concealing and misrepresenting the nature of investments being made, the timing of investments, and the status of investments in violation of SDCERA's IPS.

51. In October 2010, Partridge and his company, co-defendant Integrity Capital, signed a contract whereby Integrity Capital would provide consulting services to SDCERA. In November 2010, Houston-based investment firm Salient Partners bought Integrity Capital. Partridge then announced he was relocating to Houston to work as Salient's chief investment officer. Afterward, Partridge failed to report the risk budget overages to SDCERA's board. As a result, both the board and SDCERA's pensioners remained in the dark about Partridge's actions and the risks to which they exposed SDCERA assets.

52. Mr. Baker reported gross mismanagement by defendants White and Partridge who failed to exercise even a substandard level of performance relating to the management of SDCERA. Mr. Baker also reported defendants White and Partridge engaged in an abuse of authority because they willfully exercise their authority for improper or wrongful purpose.

53. Mr. Baker documented wrongdoing under three categories that constitute improper County government activity pursuant to California Government Code § 53297: (1) gross mismanagement; (2) significant waste of County funds; and (3) abuse of authority. Moreover, Mr. Baker documented SDCERA's

management failure to report the risk budget overages in violation of the SDCERA management's fiduciary duties under Article 16, section 17 (a), (b), and (c) of the California Constitution. Mr. Baker is a whistleblower.

54. Mr. Baker acted under his duties as an SDCERA investment officer. He also reported the overages under his duties as a Chartered Financial Analyst (CFA). CFA members **must understand and comply** with all applicable laws, rules, and regulations (including the CFA Institute Code of Ethics and Standards of Professional Conduct) (CFA Standards and Code). Mr. Baker duly did this.

55. Mr. Baker spoke out to the media as a citizen exercising his First Amendment rights on and after May 17, 2011. Partridge and White have both admitted they confirmed that what Mr. Baker had reported was true, and that the U.S. Treasury and High Yield programs were severely over budget.

56. White and Partridge both admitted they did not report to the board the risk budget overages in the High Yield and U.S. Treasury programs, as Mr. Baker had reported, until after Mr. Baker made the overages known publicly.

57. As a direct and proximate result of Mr. Baker's action of making the risk budget overages known to the taxpayers and pensioners, SDCERA began and continues to report the risk budget performance of the SDCERA pension fund.

58. Mr. Baker's actions not only were proper -- they were commendable. Consider the salutary impact of Mr. Baker's courageous acts as captured by the editorial board of the *San Diego Union-Tribune*:

**The firing of a whistle-blower**

> The unfolding story of the firing of Jeffrey Baker, an investment officer for the county pension fund, for leaking public documents to the U-T San Diego Watchdog team should outrage every county employee concerned about the conduct of higher-ups, every public employee who has money invested in the $8 billion fund, and every good-government group or taxpayer who cares about transparency in government.
>
> As outlined by Watchdog reporter Jeff McDonald this week, Baker acknowledges he did not follow protocol when he gave information regarding investment risk levels to The Watchdog. He said he did so only after taking his concerns to his supervisors and two pension board members, felt ignored by them and believed it was his fiduciary responsibility as a chartered financial analyst to come forward. Retirement system officials' justification for dismissing Baker last year – that, even if the leaked records were public documents he broke the rules for releasing information, and that there was nothing for Baker to sound the alarm about in the first place – ring hollow.
>
> Public information is public information and, if there was no cause for alarm about what was in that information, there should have been no cause for alarm on their part, either. The county pension fund is a public fund, not a vehicle for high-risk/high-reward strategies. And its management must be an open book.

<u>D. Retaliation and Removal</u>

59. Defendants Partridge and White, upon learning of Mr. Baker's action to report the truth of their: (1) gross mismanagement, (2) significant waste of County funds, (3) abuse of authority, or (4) substantial and specific danger to public health and safety, carried out a campaign of retaliation and cover-up.

60. This campaign included monitoring Mr. Baker's email and computer usage through SDCERA Information Technology employee Siobhan Maher beginning by March 2011 -- *after* Mr. Baker had brought forward the risk budget violations of SDCERA management.

61. White and Partridge, on behalf of SDCERA, embarked on a plan to remove Mr. Baker from his position as monitor of SDCERA's public market investments. A series of emails between December 21-23, 2010 show Mr. Partridge indicated that Mr. Baker did not have to monitor the U.S. Treasury program nor one of its components, Hoisington. Another email shows Mr. Baker brought the problem of the risk budget overage in the U.S. Treasury Program to the attention of his superiors as early as August 30, 2010.

62. In February 2011, Mr. Baker told SDCERA board trustee (and current board chair) David Myers that SDCERA's investments in both its High Yield and U.S. Treasury asset classes significantly exceeded its risk budgets.

63. In April 2011, Partridge instructed a subordinate, Tom Weldin (an investment analyst), to "close out" SDCERA's 30-year Treasury futures position. The realized loss on the position from its inception to April 2011 was about $35 million ion a $500 million investment – a loss of some 7%. All the while, SDCERA's position in Treasury futures had violated the IPS' risk budget for the U.S. Treasury asset class. Later that month, Mr. Baker told SDCERA trustee Dan

McAllister that SDCERA's investments in both its High Yield and U.S. Treasury asset classes significantly exceeded its risk budgets.

64. In direct retaliation for his having performed his job duties to monitor and report violations of the IPS adopted by SDCERA, Mr. Baker has suffered repeated and ongoing acts of retaliation. In acting as is alleged in this complaint, defendants acted knowingly, willfully, and maliciously, and with reckless and callous disregard for Mr. Baker's constitutionally-guaranteed rights.

**Retaliation Act No. 1: Exclusion From Meetings**

65. Mr. Baker's job function included attending SDCERA board meetings, investment meetings with staff, and other related meetings with service providers. After Mr. Baker reported the violations of SDCERA's IPS, defendants White and Partridge excluded Mr. Baker from these meetings.

**Retaliation Act No. 2: Demotion and Request to Resign**

66. Mr. Baker's job function included supervising and monitoring SDCERA's investment managers and consultants. After Mr. Baker reported the violations of SDCERA's IPS defendants White and Partridge demoted Mr. Baker by taking away his authority to monitor and supervise SDCERA investment managers and consultants. Defendants White then requested Mr. Baker to resign.

**Retaliation Act No. 3: "Layoff" Firing**

67. Defendant White fired Mr. Baker by telling him that he was being laid off. Mr. White fired Mr. Baker by telling him he was being laid off in retaliation for Mr. Baker reporting Mr. White and Mr. Partridge's violation of the SDCERA SIP. Defendant White used the pretext of a layoff to mask the action that defendant White took to fire Mr. Baker and make it appear a small part of an overall reshuffling of staff.

**Retaliation Act No. 4: "Administrative Leave" Firing**

68. Mr. Baker reported White's and Partridge's retaliation against Mr. Baker to the San Diego County Internal Affairs office. Thereafter defendants White and Partridge caused Mr. Baker to be placed on administrative leave. He was required to leave his job and was not permitted to perform his job duties.

**Retaliation Act No. 5: False Allegation of Computer Misuse, The Jennifer Anniston "Sex" tape.**

69. After they fired Mr. Baker under the guise of putting him on administrative leave, defendants White and Partridge caused false allegations to be made against Mr. Baker alleging that Mr. Baker had misused his work computer and had watched a supposed Jennifer Anniston "sex" tape.

70. Mr. Baker was required to retain at his expense a computer expert who proved that Mr. Baker did not misuse his work computer and that the "sex" tape did not exist (it was an ad for Smartwater, emailed as spam to millions of innocent computer users).

71. Defendants' false charges against Mr. Baker are an admission the claimed reason for termination was a pretext. Defendants White and Partridge were clearly motivated to do such research in an effort to dismiss Baker for other reasons entirely.

**Retaliation Act No. 6: Sham *Skelly* Hearing**

72. After Mr. Baker was placed on administrative leave defendants White and Partridge caused a *Skelly* hearing to be held to determine if Mr. Baker had engaged in conduct that warranted his dismissal. The hearing was a sham. The hearing officer was in constant contact with parties outside of the hearing room. The hearing officer paid no heed to the evidence that Mr. Baker was being terminated because he reported the violation by defendants White and Partridge of the SDCERA ISP.

**Retaliation Act No. 7: Firing**

73. After the sham *Skelly* hearing defendants White and Partridge caused Mr. Baker to be fired and to be removed from his position at SDCERA.

**Retaliation No. 8: Sham Civil Service Proceeding**

74. San Diego County Internal Affairs investigator Ron Coca, after hearing the evidence from Mr. Baker and SDCERA, told Mr. Baker emphatically that there would be a hearing before the San Diego Civil Service Commission on the issue of whether Mr. Baker was retaliated against because Mr. Baker reported the violation of the SDCERA ISP.

75. However, with no explanation, the date of the Civil Service Commission was repeatedly delayed, at the request of the Office of Internal Affairs. Also with no explanation, on the night of October 31, 2011, Mr. Coca's report was forwarded to Mr. Baker's legal counsel. The report did not recommend a hearing and was filled with factual errors.

76. When Mr. Coca was confronted with the contradiction of his actions on the phone on November 2, 2011 (the day before the scheduled meeting of the San Diego County Civil Service Commission) he stated that he had listened to the tape of his interview with Mr. Baker and that it did not record Mr. Coca's commitment that the dispute was going for a hearing before the Civil Service Commission.

77. At the Civil Service Commission hearing on November 2, 2011 Mr. Coca was confronted in open session, and did not deny he told Mr. Baker that the case was going to a hearing. During this hearing material inaccuracies and

omissions were identified in Mr. Coca's report. However, the Civil Service Commission ignored the evidence and accepted Mr. Coca's report with no hearing.

78. The Civil Service Commissioners who participated in this act of retaliation by denying Mr. Baker a hearing and confirming the report of the Internal Affairs despite its material inaccuracies were: (1) **W. Dale Bailey** -- retired minister and administrator, Rotary International of Southern California; (2) **Armando Y. (A.Y.) Casillas** -- retired-Rohr Industries Inc., Administrator Corporate Policies; **Rudolf Hradecky** -- attorney and former *pro tem* Superior Court Judge; **Francesca Mecia Krauel** -- attorney; former Assistant City Attorney for the cities of Coronado, Del Mar and Encinitas; **Bill O'Connor** -- Semi-retired business man.

**Retaliation No. 9: Delay of Civil Service Hearing**

79. Mr. Baker had requested a hearing on his having been fired. Defendants delayed this hearing until after Mr. Coca issued his report, which the Civil Service Commission adopted. White orchestrated this denial of due process.

**Retaliation No. 10: Using the Same Hearing Officers to Hear the Termination Case as Heard the Whistle Blower Case**

80. Defendant White orchestrated the Civil Service hearing process working with defendants Doe so that the same hearing officer who heard Mr. Baker's whistleblower case and denied it without affording him a hearing would

also hear his termination case. The County Civil Service Commission simply adopted wholesale the findings of a hearing officer, Francesca Krauel, a former municipal lawyer. The findings included that Mr. Baker had sent emails to the *U-T*, in violation of Civil Service rules; that this was the sole reason SDCERA had fired him; that his release of the emails to the newspaper disqualified him from being a whistleblower; that the mandates of his profession did not oblige him to release the emails to the paper; and that his position had become "redundant." Mr. Baker disagrees with the Commission's findings.

81. SDCERA, as Mr. Baker's employer, and in violation of Labor Code Section 1102.5, adopted or enforced a policy preventing Mr. Baker from disclosing information showing a violation of law or regulation to SDCERA and the San Diego County ICA, both of which are government agencies. Such a policy was not and is not constitutional, and is void.

82. SDCERA also retaliated against Mr. Baker for having disclosed information to those agencies that showed a violation of law or regulation. Mr. Baker, as an investment expert and Chartered Financial Analysis, had reasonable cause to believe that the information in his possession disclosed a violation of state or federal statute, or a violation or noncompliance with a state or federal rules or regulations.

83. SDCERA, as Mr. Baker's employer, retaliated against Mr. Baker because he refused to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

84. SDCERA and defendants White and Partridge retaliated against Mr. Baker for filing a complaint with the local agency reporting gross mismanagement, a significant waste of funds, or an abuse of authority.

D. CFA Rules of Professional Conduct

85. SDCERA and defendants White and Partridge retaliated against Mr. Baker because Mr. Baker refused to knowingly make any misrepresentations relating to investment analysis, recommendations, actions, or other professional activities. SDCERA and defendants White and Partridge retaliated against Mr. Baker because he refused to commit professional conduct involving dishonesty, fraud, or deceit or commit any act that reflects adversely on their professional reputation, integrity, or competence.

E. 42 U.S.C. § 1983

86. SDCERA, in violation of 42 U.S.C. § 1983, and through its authorized agents defendants Brian White and Lee Partridge, retaliated against Mr. Baker because Mr. Baker exercised his constitutionally-guaranteed rights of speech and

petition. Mr. Baker spoke and petitioned about whether SDCERA was complying with its ISP, which was a matter of public concern to taxpayers who are ultimately responsible for SDCERA's costs and to SDCERA members who are receiving or hope to receive pensions in the future.

87. Defendants White and Partridge, as government officials, took adverse actions against Mr. Baker because Mr. Baker spoke out in public about his complaint and the practices at SDCERA to exceed and not report violations of the risk budget. Mr. Baker's expressive conduct was a substantial or motivating factor for the adverse action taken by government officials White and Partridge.

88. In acting as alleged in this complaint, defendants White and Partridge violated Mr. Baker's rights to free speech and to petition for redress of grievances, guaranteed by the First and Fourteenth Amendments to the United States Constitution.

89. Following the *Union-Tribune* article, SDCERA management fired Mr. Baker after going through a charade of claiming to investigate whether Mr. Baker had released emails referenced in the news story. Mr. Baker cooperated and answered SDCERA's questions in writing, reported every morning at 8:30 a.m., and provided all emails on his home computer related to work.

90. Mr. Baker as a citizen decided to speak up and speak out on the risk budget overages that posed and continue to pose a threat to the welfare of the SDCERA pension fund.

91. Mr. Baker's action in speaking out as a citizen to the media was protected by the First Amendment and Article 1 of the California Constitution. SDCERA changed its risk policies and now reports the tracking error as Mr. Baker recommended shows the beneficial impact of Mr. Baker's conduct. He should be commended, not punished.

92. Mr. Baker's conduct arose out of and is connected to his rights under the First Amendment and Article 1 of the California State Constitution. He should not have been punished for exercising his rights based on the vague standards of conduct unbecoming, a failure of good behavior, conduct inimical to the public interest nor insubordination.

93. Moreover, Mr. Baker as a public employee suffered a constitutional violation when: 1) he uttered constitutionally protected speech; 2) SDCERA took "adverse employment action" against him; and 3) Mr. Baker's speech was a "substantial or motivating" factor for the adverse action.

F. Cover up

94. Mr. White and Mr. Partridge attempted to mislead pensioners, the public and the media in a series of emails directed at the newspaper in connection with a dispute that arose over Mr. Baker's publicly filed complaint alleging he was a whistleblower and that he had been fired in retaliation for bringing the risk budget overages to the attention of his superiors. At 2:24 pm on May 20, 2011, Mr. White

first told the *San Diego Union-Tribune* that the U.S. Treasury program was within its risk budget: "the tracking error for the asset class of U.S. Treasuries **is within the policy limit**." This was a lie.

95. A few hours later at 6:21 pm on May 20, 2011, Mr. White admitted he was wrong: "In my initial response, I said that the tracking error for the U.S. Treasury asset class was within policy limits. What I should have said was that the tracking error for the total portfolio is within policy limits." At 4:56 pm on May 20, 2011, Partridge incorrectly told Mr. White that one of the "major flaws" in Mr. Baker's argument was the fact that the "portfolio hasn't existed a year."

96. In fact, the U.S. Treasury program and the related Hoisington part could be measured. In fact, Mr. Partridge and Mr. White both have admitted that they knew that the tracking error was just as Mr. Baker had reported. Mr. White and Mr. Partridge both represented falsely to the newspaper that the U.S. Treasury program's tracking error could not be measured because it has not been with SDCERA for 36 months. A newspaper article appeared in the *Union-Tribune* on May 21, 2011 quoting Mr. Baker and Mr. White and explaining Mr. Baker's contention that he was a whistleblower who had reported the U.S. Treasury and High Yield programs were being operated by Mr. Partridge over their respective risk budgets.

97. Finally, at the investment board's meeting on June 16, 2011, Partridge admitted the truth: SDCERA was over its risk budgets in both the high yield and

U.S. Treasury asset classes, as Mr. Baker had said all along. This was the first occasion on which Partridge formally admitted to his superiors the risk budget overages. It was the tenth (10th) meeting of SDCERA's board after Mr. Baker had first reported the risk budget overages to Partridge.

98. Two months later, in July 2011, the board approved an increase to the risk budgets – to levels higher than the overages then extant. It quadrupled the tracking error limit in the high yield class, from 200 basis points to 800; and it more than quadrupled the tracking error limit in the U.S. Treasuries class, from 75 to 400.

99. For Partridge and White, all of this was too embarrassing to admit without punishing the person who had brought it up (Mr. Baker) and covering up their own wrongdoing. So they hired a high-powered government and public relations lobbyist known as Southwest Strategies. On August 4, 2011 the *San Diego Union-Tribune* reported that SDCERA had secretly retained and paid $76,000 to Southwest Strategies between April 2010 and June 2011.

100. The OIA investigator Ron Coca emphatically declared that the complaint was going to a hearing before the Civil Service Commission. As part of the cover up Mr. Coca without any notice or opportunity to be heard altered his recommendation to one disallowing even a hearing before the Civil Service Commission.

101. As part of the cover up OIA investigator Ron Coca recommended Mr. Baker's whistleblower complaint be dropped. However, under oath Coca admitted he *never* confirmed what was shown to be false information he received from SDCERA -- that Lee Partridge and SDCERA management *had* reported the tracking error of the High Risk program in general and the Hoisington portfolio specifically.

G. Damages

102. Defendants White and Partridge colluded to carry out a plan of retaliation that inflicted permanent damage on Mr. Baker. Mr. Baker lost his job, his opportunity for advancement and the ability to work elsewhere in his chosen profession. He has been denied jobs with the following employers as a direct and proximate result of defendants' unlawful conduct:

| **NO.** | **Employer** |
|---|---|
| 1 | Portfolio Manager for a high net worth bank |
| 2 | Research Associate for national consultant<br>Investment Manager for a corporate pension fund |
| 3 | Vice President for a Fund of Funds |
| 4 | Director of Research for national consultant |
| 5 | Intl Equity Investment Consultant for national consultant |
| 6 | Marketable Alternative Assets Specialist at national consultant |
| 7 | Investment Officer for county pension fund |
| 8 | Institutional Investment Manager at insurance co. |
| 9 | Manager Research Consultant at national consultant |
| 10 | Public Equity Investment Officer at state public |

| | |
|---|---|
| | fund |
| 11 | Investment Manager at corporate pension fund |
| 12 | Director of Investments at global conservation endowment |
| 13 | Senior Portfolio Manager at county/city pension fund |
| 14 | Investment Officer for state pension fund |

103. The facts detailed in this complaint demonstrate that the financial, civil service, ethical, moral and legal controls within San Diego County government as it relates to SDCERA, the Office of Internal Affairs, and the Civil Service Commission have broken down. The facts of this case show there is within the offices a pervasive environment of disrespect for legal controls, disregard for due process rights, and shining contempt for ethical constraints.

104. Mr. Baker has exhausted all administrative remedies and preconditions to filing this complaint including with SDCERA, the County of San Diego, and the State of California.

**FIRST CLAIM FOR RELIEF**
**(for Violation of Rights under Color of State Law under 42 U.S.C. § 1983)**

**(Against Defendants White and Partridge)**

105. Mr. Baker repeats and re-alleges each and every allegation in this complaint as though set forth herein below.

106. Mr. Baker spoke and petitioned concerning a matter of public concern. Mr. Baker analyzed and discovered that Partridge was not following prudent

management policies of the pension plan and that Partridge had deployed an investment strategy in the public markets segment that severely exceeded the risk budget of the investment policy adopted SDCERA, thus threatening taxpayers, who are ultimately responsible for SDCERA's investment losses.

107. Defendant Brian White and Lee Partridge were governmental officials or performing functions equivalent to government officials. Defendants White and Partridge retaliated against Mr. Baker by demoting him, placing him on a pretext "administrative" leave, and firing him. Lee Partridge took adverse action against Mr. Baker by removing Mr. Baker from his responsibilities to monitor investment managers. In addition, defendant Partridge, in retaliation for Mr. Baker's exercise of his rights to speak and petition, excluded Mr. Baker from staff investment meetings, board meetings, investment manager meetings.

108. Defendants White and Partridge also retaliated against Mr. Baker by making false allegations that Mr. Baker did not know how to conduct the risk budget analysis, and that he had misused his computer. The government officials caused unfounded allegations of wrongdoing to be made against Mr. Baker. They claimed Mr. Baker had misused his computer to watch a supposed Jennifer Aniston "sex tape." Mr. Baker had not done so and the "sex tape" was simply a spam advertisement for a benign beverage product.

109. Mr. Baker's computer expert also proved that the other allegations made by the government officials against Mr. Baker involving supposed misuse of

his work computer were wrong. Those claims were dropped by the governmental officials.

110. Later in 2011, defendants' actions became particularly mean-spirited. Defendants tried to prevent Mr. Baker from collecting unemployment insurance. Defendants objected to Mr. Baker's unemployment claim; hired outside counsel to contest the issue before the Unemployment Board; presented false testimony at the unemployment hearing; and, afterward, filed an appeal from the Board's decision (which had gone in Mr. Baker's favor). It was not enough for defendants to fire Mr. Baker and violate his civil rights. Defendants had to try to make him destitute and homeless – a sort of vindictive meanness which seems without parallel.

111. The governmental officials further retaliated against Mr. Baker by orchestrating the date on which his whistleblower complaint was heard by the Civil Service Commission so that it was denied before Mr. Baker was afforded a fair hearing.

112. Mr. Baker's expressive conduct warning against SDCERA's violations of the risk budget was a substantial or motivating factor for the adverse action taken by the government officials against Mr. Baker.

113. The adverse action was reasonably likely to deter employees from engaging in constitutionally protected speech. The government officials placed Mr. Baker on administrative leave after he voiced his concerns and filed his

complaint. The government officials refused to reinstate Mr. Baker despite his having rendered true and faithful service as required by his moral, ethical, and legal duties.

114. These adverse actions were motivated by Mr. Baker's speech and petitioning. Mr. Baker was reprimanded, demoted, placed on administrative leave and fired in retaliation for Mr. Baker's reporting that his superiors were putting pension assets at risk.

115. The government officials did not act reasonably under the totality of the circumstances nor did they act in reasonable reliance on a clearly established statute or constitutional provision.

116. The government officials had policy-making authority. The governmental officials adopted a defined policy that operated to violate Mr. Baker's civil rights.

117. Mr. Baker's claims arise out of unconstitutional actions by the governmental officials who were employees of SDCERA and the County of San Diego and acting within the course and scope of their agency.

118. The defendants' wrongful actions implemented the policy and decisions officially adopted and promulgated by SDCERA's officers. The wrongdoing was done within SDCERA's scope of implementation of SDCERA's policies and customs. Each of the defendants acted in their official capacity.

119. The individual defendants, by their misconduct herein alleged, acted in an arbitrary, capricious and fraudulent manner, and without any reasonable basis in law or substantial basis in fact. In so doing, and under color of the law of California, they subjected, and caused to be subjected, Mr. Baker to deprivation of its rights, privileges, and immunities secured by the United States and California Constitutions, including without limitation the First and Fourteenth Amendments to the United States Constitution.

120. Defendants' punishments, retaliations, and wrongful firing of Mr. Baker were fatally arbitrary, egregious, and oppressive. Defendants' actions were outrageous and egregious because they were deliberately calculated to conceal from the public their mismanagement of millions of dollars in trust funds and Partridge's and Integrity Capital's self-dealing. Defendants' motivation was illegal and pernicious because motivated by the desire to deceive the public and punish a conscientious public servant for doing his duty. Defendants' actions constituted a deliberate flouting of the law, which protected Mr. Baker from such action. Defendants' deliberate disregard of the laws constituted a denial of Mr. Baker's rights to substantive due process and deprived Mr. Baker of his property interest in his employment. Defendants' misconduct amounted to a deliberate flouting of Mr. Baker's constitutional and statutory rights.

121. Defendants' actions also violated Mr. Baker's procedural due process rights (by denying Mr. Baker a fair hearing at a reasonable time and in a

reasonable manner). Defendants contrived an investigation and Civil Service Commission proceeding which were grossly unfair, a sham, and calculated to result in a predetermined outcome adverse to Mr. Baker. Mr. Baker had the right to a prompt, proper, and fairly conducted investigation and Civil Service Commission hearing. Neither happened. As a result, Mr. Baker was denied the right to be heard at a meaningful time and in a meaningful manner. The result was deprivation of Mr. Baker's property interests in his employment and liberty interest in free speech and right to petition the government, in violation of the First and Fourteenth Amendments to the U.S. Constitution.

122. As a direct and proximate result, Mr. Baker has suffered damages in an amount to be proven at trial. Defendants also acted wantonly, willfully, maliciously, and fraudulently. As a consequence, they should be assessed exemplary damages so as to punish and make an example of them and in order to deter others from similar misconduct in the future. Mr. Baker also is entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. 1988.

**SECOND CLAIM FOR RELIEF**
**(for Violation of California Labor Code Section 1102.5)**
**(Against All Defendants Except Integrity Capital LLC)**

123. Mr. Baker repeats and realleges each and every allegation in this complaint as though set forth hereinbelow.

124. SDCERA, through defendants White and Partridge, violated California Labor Code section 1102.5 because defendants White and Partridge retaliated on behalf of SDCERA against Mr. Baker, an SDCERA employee, for disclosing true information to government and law enforcement agencies.

125. Mr. Baker has, as a litigant seeking damages under section 1102.5, exhausted his administrative remedies before the Labor Commissioner prior to bringing suit.

126. Defendants White and Partridge retaliated against Mr. Baker because Mr. Baker disclosed unlawful and improper conduct to the Office of Internal Affairs and to other governmental bodies by virtue of public disclosure.

127. Mr. Baker's suffered damages as a direct and proximate result, in the form of lost wages, future earnings, and lost income in a sum exceeding $1,000,000.

**THIRD CLAIM FOR RELIEF**
**(Under California Government Code section 53298 *et seq.*)**
**(Against Defendants Partridge and White Only)**

128. Mr. Baker repeats and realleges each and every allegation in this complaint as though set forth hereinbelow.

129. Defendants White and Partridge are local agency officers, managers, or supervisors who retaliated against Mr. Baker, an SDCERA employee, because Mr. Baker filed a complaint with SDCERA reporting the gross mismanagement

involving a significant waste of funds, an abuse of authority, or a specific and substantial danger to public health or safety in violation of California Government Code section 53298(a).

130. Mr. Baker's claim under section 53298 arises out of his allegations that he was excluded from meetings, demoted, and placed on “administrative leave,” as a pretext; made the subject of false allegations; fired; and kept from receiving unemployment because of (1) his written reports of serious violations by defendant Partridge and White of the SDCERA investment policy, (2) the retaliation Mr. Baker reported, and (3) in order to punish Mr. Baker for exercising his First Amendment Rights.

131. Mr. Baker (1) filed a complaint with a local agency regarding gross mismanagement, a significant waste of funds, an abuse of authority, or a specific and substantial danger to public health or safety; (2) Mr. Baker’s complaint was filed within 60 days of the date of the act or event that is the subject of the complaint; (3) Mr. Baker’s complaint was filed under penalty of perjury; (4) the complaint was filed in accordance with the locally adopted administrative procedure, or in the alternative there was no administrative procedure available; (5) the employee has made a good faith effort to exhaust all available administrative remedies before filing the complaint; and (6) a local agency officer, manager, or supervisor took a reprisal action against the employee for filing the complaint.

132. Mr. Baker suffered damages as a direct and proximate result, in the form of lost wages, future earnings, and lost income in a sum exceeding $1,000,000.

**FOURTH CLAIM FOR RELIEF**
**(for Wrongful Interference With Contract)**
**(Against Defendants Partridge and Integrity Capital Services LLC Only)**

133. Mr. Baker repeats and realleges each and every allegation in this complaint as though set forth hereinbelow.

134. Mr. Baker had a valid contract with SDCERA since December 21, December 2007 to act an investment officer for public markets.

135. Defendants Partridge and Integrity Capital knew of the above described contract existed between Mr. Baker and SDCERA.

136. Partridge and Integrity Capital engaged in the acts of retaliation above with the intent to harm Mr. Baker financially and to induce SDCERA to breach and terminate Mr. Baker’s contract with SDCERA.

137. As a direct and proximate result, SDCERA terminated and cancelled Mr. Baker’s contract with SDCERA.

138. As a direct and proximate result of defendants’ Partridge and Integrity Capital’s conduct, Mr. Baker has suffered loss of income, loss of earnings, loss of prospective earnings, and general damages.

139. Defendant Partridge and Integrity Capital LLC acted willfully, and with oppression, fraud and malice. Mr. Baker is therefore entitled to punitive damages.

WHEREFORE, Mr. Baker prays for judgment against defendant(s) as follows:

**<u>Upon the First Claim for Relief</u>**

1. For compensatory damages, in an amount to be determined according to proof at trial;

2. For punitive damages, in an amount to be determined according to proof at trial;

3. For reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

4. For costs of suit incurred in this action;

**<u>Upon the Second and Third Claims for Relief</u>**

5. For general damages according to proof at trial,

6. For special damages consisting of lost income, wages, salaries, interest income, raises, and job opportunities exceeding according to proof at trial;

**<u>Upon the Fourth Claim for Relief</u>**

7. For compensatory damages in an amount to be determined according to proof at trial;

8. For punitive damages, in an amount to be determined according to proof at trial;

9. For reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

10. For costs of suit incurred in this action;

**Upon All Claims for Relief**

11. For costs of suit.

12. For all other relief deemed appropriate.

Dated: May 24, 2012 LAWTON LAW FIRM

By: /s/Dan Lawton
Dan Lawton
Attorneys for Plaintiff

DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury as to all issues triable by jury.

Dated: May 24, 2012

LAWTON LAW FIRM

By: /s/Dan Lawton
Dan Lawton
Attorneys for Plaintiff